**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Daniel D. Domenico**

Civil Action No. 1:23-cv-02421-DDD-KAS

AIR TRANSPORT ASSOCIATION OF AMERICA, INC. d/b/a Airlines for America,

Plaintiff,

v.

KRISTINA ROSETT, in her official capacity as Director of the Division of Labor Standards and Statistics at the Colorado Department of Labor and Employment,

Defendant.

---

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

---

Colorado's Healthy Families and Workplaces Act sets forth minimum sick-leave requirements for all employees working in Colorado. Plaintiff Air Transport Association of America, Inc. contends that, as applied to airline workers, the Workplaces Act is preempted by the federal Airline Deregulation Act and violates the dormant Commerce Clause of the United States Constitution. Defendant Kristina Rosett, the Director of the Division of Labor Standards and Statistics at the Colorado Department of Labor and Employment, moves for summary judgment, arguing that, as a matter of law, the Workplaces Act is not preempted and does not violate the Commerce Clause. Doc. 90. For the following reasons, the Director's summary-judgment motion is denied.

**BACKGROUND**[1]

Air Transport is a nonprofit organization that advocates on behalf of seven passenger air carriers and three cargo air carriers. Doc. 1 at 4-5. It challenges the application of Colorado's Healthy Families and Workplaces Act, Colo. Rev. Stat. §§ 8-13.3-401 to 418, to the flight-crew and ground-crew employees of five of those passenger airlines.

Flight-crew employees (*i.e.*, pilots and flight attendants) are mobile workers who do not work regularly scheduled shifts. Each flight-crew employee is assigned a "base" location where the employee begins and ends work assignments, which may or may not be the same place where the employee lives. Federal regulations require the airlines to have a minimum number of pilots and flight attendants aboard an aircraft before passengers may board or the aircraft may take off, and on most flights, the airlines operate with the minimum required staffing levels. Because of this, if a flight-crew employee is absent, the airlines must find a replacement for that employee before a flight can board and depart. The airlines use mitigation measures (*e.g.*, reserves, reassignments, and deadheading) to replace absent flight-crew members. The parties dispute the degree to which flight-crew absences cause flight delays and cancellations and the degree to which the airlines' mitigation measures can effectively minimize such disruptions.

Ground-crew employees (*e.g.*, ticket agents, gate agents, baggage handlers) typically live near the airport where they work. "Above-the-

---

[1] The following facts are undisputed unless otherwise noted. Absent citation to another part of the record, these facts are drawn from the parties' statements of facts. *See* Doc. 90 at 4-7; Doc. 91 at 7-14; Doc. 99 at 3-10. In this Order, pinpoint citations to the record use the blue page number appended by the Court's Electronic Case Filing system at the top of each page, which may differ from a document's internal pagination.

wing" ground-crew employees work in a customer-service role inside the airport. "Below-the-wing" ground-crew employees perform services such as baggage handling, aircraft maintenance, and taxiing assistance. The airlines use mitigation measures (*e.g.*, overtime, bullpens) to replace absent ground-crew employees. According to Air Transport, ground-crew absences cause impacts including longer passenger wait times at ticket counters, gate changes and delayed boarding, longer passenger wait times on the tarmac, more mishandled bags, longer passenger wait times for baggage, and flight delays and cancellations. The parties dispute the degree to which ground-crew absences cause such impacts and the degree to which the airlines' mitigation measures can effectively minimize those impacts.

The airlines comply with numerous federal, state, and municipal employment laws, including paid sick-leave laws, in multiple jurisdictions nationwide. Colorado's Workplaces Act has been in effect since July 14, 2020, Doc. 1 at 16, and it sets forth minimum sick-leave requirements for all employees working in Colorado.

As relevant here, the Act (1) requires that employees accrue a minimum amount of sick leave; (2) allows employees to use sick leave for, among other things, (a) their own illness, (b) their own doctors' visits to obtain diagnosis, treatment, and preventative care, (c) attendance at family members' funeral or memorial services, and (d) care of family members who are ill or need to attend doctors' visits; (3) requires that employees be provided additional sick leave during a public-health emergency, which may be used for things including (a) contracting the illness that is the cause of the public-health emergency, (b) self-isolation to prevent transmission after contracting the illness, (c) caring for family members who have contracted the illness or are self-isolating to prevent transmission, and (d) inability to work due to increased

susceptibility to the illness; (4) permits employers to require a doctor's note or other documentation for use of regular sick leave only when an employee uses four or more consecutive days of leave, and does not permit employers to require documentation for use of public-health-emergency sick leave; and (5) prohibits employers from counting an employee's use of sick leave as an absence that may lead to discipline. *See generally* Colo. Rev. Stat. §§ 8-13.3-401 to 418.

The airlines' employment terms are set forth in collective bargaining agreements and company policies. Those CBAs and policies provide paid sick leave that employees can generally use for their own illness, as well as flexibility for employees to take additional time off and schedule and trade shifts. The CBAs and policies typically have "accountability tools" regarding employee attendance and absences, which include points systems and requirements for doctors' notes. The Workplaces Act expands the reasons for which employees can use sick leave and restricts the airlines' use of points systems and doctors' notes. The parties dispute whether the airlines' CBAs and policies incentivize "presenteeism" (*i.e.*, working while ill or impaired), and whether the Workplaces Act reduces it. They also dispute whether the Workplaces Act has caused or likely will cause increased employee absences and sick-leave abuse, and the degree to which any such increase in turn has impacted or likely will impact the airlines' services and interstate commerce.

Air Transport has two remaining claims for relief. It contends that, as applied to the flight-crew and ground-crew employees of five of its member airlines, the Workplaces Act (1) is expressly preempted by the federal Airline Deregulation Act, 49 U.S.C. § 41713; and (2) violates the

dormant Commerce Clause of the United States Constitution, art. I, § 8, cl. 3.[2] Air Transport seeks declaratory and injunctive relief. Doc. 1 at 33.

## STANDARD OF REVIEW

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the suit under the governing law, and a factual dispute is genuine if a rational factfinder could find for the nonmoving party on the evidence presented. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists. *Id.* But a movant that does not bear the ultimate burden of persuasion on a claim at trial need not disprove the claim; the movant need only identify a lack of evidence for the nonmovant on an essential element of the claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

In considering a motion for summary judgment, courts do not weigh the evidence, and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Adamson*, 514 F.3d at 1145; *Scott v. Harris*, 550 U.S. 372, 378 (2007). But a nonmovant's unsupported conclusory allegations or mere traces of evidence are not sufficient to demonstrate a genuine factual dispute. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo.

[2] I previously dismissed Air Transport's claim that the Workplaces Act is preempted by the federal Railway Labor Act, 45 U.S.C. §§ 151-88t. *See* Doc. 55.

2009); *Scott*, 550 U.S. at 380 ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). The nonmovant must offer "specific facts that would be admissible in evidence in the event of trial, from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). If a reasonable factfinder could not return a verdict for the nonmoving party, summary judgment is proper, and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

### I. Airline Deregulation Act

#### A. Applicable Law

Air Transport, as the party asserting preemption, bears the ultimate burden to "show[] with specificity that Congress intended to preempt state law." *Day v. SkyWest Airlines*, 45 F.4th 1181, 1184 (10th Cir. 2022). Express preemption applies when Congress "defines explicitly the extent to which its enactments" preempt state law. *Id.* The Airline Deregulation Act's preemption provision provides that a state "may not enact or enforce a law . . . related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).

A state law is thus preempted if the law has "a connection with, or reference to, airline 'rates, routes, or services.'" *Day*, 45 F.4th at 1185 (quoting *Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374, 384 (1992)). A state law is impermissibly "connected with" airline prices, routes, or services "if the law (1) governs a central matter of an airline's prices,

routes, or services; (2) interferes with uniform national policies regarding airline prices, routes, or services; or (3) will have acute economic effects that effectively limit airlines' choices regarding their prices, routes, and services." *Id.* at 1186. Preemption may occur even if a state law's effect on rates, routes, or services "is only indirect." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008).[3] But a law is not impermissibly "connected with" airline prices, routes, or services if it has only a "tenuous, remote, or peripheral" connection with them, "as is the case with many laws of general applicability." *Day*, 504 F.4th at 1185. The question is whether the state law at issue has a "'significant impact' related to Congress' deregulatory and pre-emption-related objectives." *Rowe*, 552 U.S. at 371. When evaluating a state law for the existence of a "forbidden connection," courts must therefore consider (1) "the objectives of the ADA, which provide 'a guide to the scope of the state law that Congress understood would survive,'" and (2) "the nature of the effect of the state law on" airline prices, routes, and services. *Day*, 504 F.4th at 1187.

**B. Analysis**

I have carefully reviewed the parties' statements of facts and the supporting evidence submitted, which is extensive. *See* Docs. 90-1 to 90-6; Docs. 91-1 to 91-105; Docs. 93-1 to 93-42. At the pleadings stage, I noted that the Director "ma[de] a strong case for a finding of no preemption," Doc. 55 at 8-9 & n.3, and the same is true at the summary-judgment stage. But as explained above, a court cannot weigh the evidence at

---

[3] *Rowe* assessed whether a Maine law was preempted by the Federal Aviation Administration Authorization Act, which applies to motor carriers. 552 U.S. at 368. Because that statute uses the same "related to" preemption language as that used in the Airline Deregulation Act, precedent interpreting both statutes is relevant here. *See id.* at 368, 370 ("In *Morales*, this Court interpreted the pre-emption provision in the Airline Deregulation Act . . . . And we follow *Morales* in interpreting similar language in the [FAAAA].").

summary judgment. And construing the evidence in the light most favorable to Air Transport, a reasonable factfinder could find that the Workplaces Act has an impermissible effect on airline services that undermines the Airline Deregulation Act's objectives.

For example, Air Transport has submitted evidence that at least some of its member airlines have experienced an increase in employees' use of sick leave following the enactment of the Workplaces Act. *See, e.g.*, Doc. 91-2 at 113-21 (expert report analyzing impact of sick-leave policies American, Southwest, and Alaska airlines implemented to comply with Act). It has also submitted evidence that there is "a statistically significant and consistent relationship: as airline employee sick rates rise, flight delays and cancellations rise too." Doc. 91-1 at 36. The Director takes issue with the methods Air Transport's expert used to reach those conclusions. *See, e.g.*, Doc. 99 at 7. He has also submitted a competing expert opinion that "the evidence and analysis presented by [Air Transport] do not establish that [the Workplaces Act] measurably changed airline 'services' in Colorado in a way that binds or limits carriers' choices," Doc. 90-2 at 2-3, and he argues that Air Transport cannot demonstrate that the Act has resulted in the type of acute economic effects required for preemption, Doc. 90 at 20-22. *See Day*, 45 F.4th at 1186. But as noted above, the parties dispute the degree to which airlines can effectively mitigate flight delays and cancellations that might be caused by employee absences. *Compare, e.g.*, Doc. 90-1 at 3-4 (airlines have demonstrated ability to handle variability in staffing and adapt to sick-leave laws in numerous jurisdictions without material service reductions or changes), *with, e.g.*, 91-1 at 5 ("[A]irline mitigation efforts cannot effectively alleviate either the impact of existing absenteeism or the incremental impact of HFWA-induced increases in absenteeism."). Evaluating whether the Act's impact on airlines' services is tenuous or significant and weighing the credibility of competing expert testimony

are the types of determinations that are inappropriate for a court to make at summary judgment. *See SEC v. Nacchio*, No. 05-cv-00480-MSK-CBS, 2008 WL 4587240, at *3 (D. Colo. Oct. 15, 2008) ("Ordinarily, a summary judgment motion does not provide an appropriate vehicle for resolving conflicting expert opinions." (citing *Abilene Retail No. 30, Inc. v. Bd. of Comm'rs*, 492 F.3d 1164, 1184, 1188 (10th Cir. 2007) (Ebel, J., concurring)).

The Director's motion for summary judgment is therefore denied as to Air Transport's first claim.

## II. Dormant Commerce Clause

### A. Applicable Law

The Commerce Clause of the United States Constitution provides that "Congress shall have power . . . [t]o regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. This clause not only affirmatively grants power to Congress, but also has been held to include a negative implication known as the "dormant" Commerce Clause, which restricts permissible state regulation of interstate commerce. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023). Modern dormant Commerce Clause jurisprudence is "driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)). "[T]his antidiscrimination principle lies at the 'very core' of . . . dormant Commerce Clause jurisprudence." *Nat'l Pork*, 598 U.S. at 369.

A law that discriminates against interstate commerce is "virtually *per se* invalid," and will survive only if it "advances a legitimate local

purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Davis*, 553 U.S. at 338. But even a law that is neutral and nondiscriminatory on its face may be invalid if its "practical effects . . . disclose the presence of a discriminatory purpose." *Nat'l Pork*, 598 U.S. at 377.

In *Pike v. Bruce Church, Inc.*, the Supreme Court held that a facially neutral law that "regulates even-handedly to effectuate a legitimate local public interest" with "only incidental" effects on interstate commerce "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." 397 U.S. 137, 142 (1970). The "incidental burdens" of the *Pike* inquiry "are the burdens on interstate commerce that exceed the burdens on intrastate commerce." *Forever Fencing, Inc. v. Bd. of County Comm'rs of Leavenworth County*, No. 23-3140, 2024 WL 3084973, at *3 (10th Cir. June 21, 2024) (quoting *V-1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415, 1425 (10th Cir. 1997)). The Court has recently reiterated "that its Commerce Clause cases evaluated under *Pike* are not entirely distinct from its antidiscrimination cases." *Forever Fencing*, 2024 WL 3084973, at *3 (citing *Nat'l Pork*, 598 U.S. at 377). "The Court noted that *Pike* itself turned on the discriminatory character of the challenged statute, as revealed by its practical effects." *Id.* (citing *Nat'l Pork*, 598 U.S. at 377-78 (citing "cases in the *Pike* line" in which "the presence or absence of discrimination in practice proved decisive")).

Even so, the Court left the "courtroom door open" to dormant Commerce Clause challenges premised on "even nondiscriminatory burdens," and recognized that "a small number of [its] cases have invalidated state laws . . . that appear to have been genuinely nondiscriminatory." *Nat'l Pork*, 598 U.S. at 379 & n.2 (citing *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997) (collecting cases)). "Most notably,

[there is] a line of cases that originated before *Pike* in which th[e] Court refused to enforce certain state regulations on instrumentalities of interstate transportation—trucks, trains, and the like." *Id.* at 379 n.2 (citing *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 523-30 (1959) (concerning state law specifying certain mud flaps for trucks and trailers); *S. Pac. Co. v. Ariz. ex rel. Sullivan*, 325 U.S. 761, 763-82 (1945) (state law regarding length of trains)). Though the state laws at issue in those transportation cases "did not impose disparate treatment on similarly situated in-state and out-of-state interests," they were invalidated because they "undermined a compelling need for national uniformity in regulation." *Tracy*, 519 U.S. at 298 n.12. The Court, though, "has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods." *Nat'l Pork*, 598 U.S. at 379 n.2 (emphasis omitted) (quoting *Exxon Corp. v. Gov. of Md.*, 437 U.S. 117, 128 (1978)); *see also Ass'n to Preserve & Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 57 (1st Cir. 2025) (in this line of cases, "the challenged regulation required an instrumentality of interstate commerce . . . to either comply with that regulation or not pass through the regulating jurisdiction at all").

### B. Analysis

Once again, the Director makes a persuasive case that the evidence tips in her direction under the governing law. *See* Doc. 55 at 12-13 & n.5. But the same types of conflicting evidence that preclude summary judgment regarding the impact of the Workplaces Act on airlines' services, *see supra* Discussion, Part I(B), also preclude summary judgment regarding the extent to which the Act burdens interstate commerce. And once again, given the relatively indeterminate legal standards and viewing the summary-judgment evidence in Air Transport's favor, a

reasonable factfinder could conclude that the practical effects of the Act impermissibly impede the interstate flow of passengers, and that this burden on interstate commerce is clearly excessive in relation to the Act's benefits.

The Director's motion for summary judgment is therefore denied as to Air Transport's second claim.

## CONCLUSION

It is **ORDERED** that:

Defendant's Motion for Summary Judgment, **Doc. 90**, is **DENIED**; and

Plaintiff's Motion for Leave to File a Surreply in Response to Defendant's Reply in Support of Motion for Summary Judgment, **Doc. 101**, is **GRANTED**, and I have considered the plaintiff's surreply, Doc. 101-1.

DATED: September 30, 2026

BY THE COURT:

Daniel D. Domenico
Chief United States District Judge